## MODERNISTIC CANDIES, Inc., et al. v. FEDERAL TRADE COMMISSION.

### No. 8356.

Circuit Court of Appeals, Seventh Circuit.

Nov. 15, 1944.

Irvin H. Fathchild, of Chicago, Ill., for petitioners.

Joseph J. Smith, Jr., W. T. Kelley, Chief Counsel, and Eugene W. Burr, Sp. Atty., all of Washington, D. C., for respondent.

Before EVANS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

On July 16, 1943, the petitioners filed in this court a petition to review a cease and desist order issued by the Federal Trade Commission on May 25, 1943, in proceedings instituted by the Commission pursuant to section 5(a) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a).

The petitioners market chewing gum in various flavors by means of a "Ballgum" board. This is a punch board with pockets for 150 small balls of gum. The holes in which the gum balls are placed are pasted over with sheets of paper so that the customer, punching out one of these little balls of gum, does not know what flavor or color of gum he is going to receive. Of the 150 balls of gum on the board, 20 or 24 are of one color, and the balance are of a different color. The merchant may, of course, if he so desires, merely sell these gum balls to his customers at a penny a piece.

My colleagues and I experimented with one of the exhibits to the extent of several punches. Two of us punched out white balls, but Judge Evans punched out a red ball. The gum ball was palatable but seemed to contain less gum than the ordinary stick. There would seem to be no particular inducement to a customer to buy gum in this manner. Our experiment told us that the board was not designed to operate as simply as this. The seller of that board had something else in mind.

The evidence is that when a ball of the off-colored gum was punched out, the merchant would give a prize of some kind to the lucky customer, usually a stick of candy or a candy bar. The number of off-colored balls was printed on the face of the board, and from this information the merchant could determine what value of prize he could afford. The setup was a perfect way to garner children's pennies although the record showed that adults were equally attracted, which reminds us of what the poet said, that "the child is father to the man."

Counsel for the petitioner discussed at great length from a sociological point of view, the age-old problem of the gambling instinct in the human being. According to his analysis, gambling pervades our entire economic system; thus insurance contracts are gambles, stock and grain exchange transactions are gambles, and the farmer's dependence on the weather is a gamble.

Counsel's attempts to apply this analysis to the present case left us cold and unimpressed. He even reminded us that our great idol, Mr. Chief Justice Marshall in his day attended the horse races and wagered with his clergyman. In fact, they ran a book. As indicating how times have changed, and how even our coarse nature has yielded to the protecting care of governmental policy, we confess we do not even know a bookmaker, clerical or otherwise, and our passes to the beautiful race tracks around Chicago lie in our desk unused.

There may be in every child the impulse that prompts him to take a chance, but it has been the public teaching and the public policy of the land that gambling is immoral and to be condemned. The Federal Government has made it a criminal offense to transport lottery tickets or to cause them to be transported in interstate commerce. 18 U.S.C.A. § 387. Lotteries used in the marketing of merchandise have long been condemned by the Supreme Court and by this court. The cases are legion.

In Federal Trade Commission v. R. F. Keppel & Brother, Inc., 291 U.S. 304, 54 S.Ct. 423, 426, 78 L.Ed. 814, candy was sold by the piece and if it contained a certain number or legend when broken open, the lucky customer received as a prize another piece of candy, his purchase price, or some other small prize. Of this scheme, the Supreme Court said, "Such devices have met with condemnation throughout the community. * * * it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy." In that case the condemned gambling device and the merchandise to be used with it were sold together as a unit. It is clear, under the Keppel case that such a method of merchandising is within the power of the Federal Trade Commission to prohibit by a cease and desist order.

The Keppel case, however, does not cover the case at bar because the article sold here, the Ballgum board, is incomplete in itself as a game of chance. No prizes are provided. The board, however, is designed, intended, and conducive to gambling; its use suggests, and was intended to encourage, gambling. Our question then is whether such a method of merchandising is an unfair trade practice contrary to public policy and within the power of the Federal Trade Commission to prohibit by use of a cease and desist order where the article sold is not complete in itself for merchandising by means of a game of chance, but is so devised, planned, and constructed as to encourage and induce its use for this purpose.

■■ "The public policy of a State is to be found embodied in its constitution and its statutes, and, when these are silent on the subject, in the decisions of its courts." Illinois Bankers Life Association v. Collins, 341 Ill. 548, 551, 173 N.E. 465, 466. Recently we said in Maltz v. Sax, 134 F.2d 2, 4, "Moreover, in the absence of any statute condemning gambling as illegal, the Federal courts have consistently condemned it as against public policy." We have also held that those who aid and abet such a method of merchandising, those participes criminis with gamblers and their schemes, are likewise engaged in unfair trade practices contrary to public policy. Jaffe v. Federal Trade Commission, 7 Cir., 139 F.2d 112; Koolish v. Federal Trade Commission, 7 Cir., 129 F. 2d 64; Maltz v. Sax, supra. The device used in the case at bar is too apparently allied with the purpose of merchandising by gambling to appeal to a court as being a fair trade practice, particularly designed as it is to appeal to children's trade and to appease their desire to get something for nothing.

■ It is clear that the Federal Trade Commission has the power to eradicate merchandising by gambling in interstate commerce. We think the Commission also has the power to prohibit the distribution in interstate commerce of devices intended to aid and encourage merchandising by gambling. The gamblers and those who deliberately and designedly aid and abet them are both engaged in practices contrary to public policy. Merchandising by gambling should not be divided into insulated acts, which appear innocent when examined separately. This unfair practice should be viewed as a whole. If the Federal Trade Commission is to police merchandising by gambling, it must police those who designedly and deliberately aid and abet this practice. We think the Commission has such power.

The petition to review is denied.